1    **WO**                          NOT FOR PUBLICATION

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

8

9    Patricia Ann Simmons,                    No. CV-14-02286-PHX-JJT

10                   Plaintiff,                **ORDER**

11   v.

12   Carolyn W. Colvin,

13                   Defendant.

14          At issue is the denial of Plaintiff Patricia Ann Simmons's Application for
15   Disability Insurance Benefits by the Social Security Administration ("SSA") under the
16   Social Security Act ("the Act"). Plaintiff filed a Complaint (Doc. 1) with this Court
17   seeking judicial review of that denial, and the Court now considers Plaintiff's Opening
18   Brief (Doc. 15, "Pl.'s Br."), and Defendant Social Security Administration
19   Commissioner's Opposition (Doc. 16, "Def.'s Br.").

20   **I.    BACKGROUND**

21          Plaintiff filed an Application for a Period of Disability and Disability Insurance
22   Benefits under Titles II and XVIII of the Act on August 10, 2011, for a Period of
23   Disability beginning January 28, 2011. (Docs. 12-13, R. at 168-69.) The parties do not
24   dispute that Plaintiff's Last Date Insured for purposes of determining benefits under the
25   Act is June 30, 2016. (R. at 22.) Plaintiff's claim was denied initially on December 14,
26   2011, (R. at 114), and on reconsideration on July 18, 2012, (R. at 122). Plaintiff testified
27   at a hearing held before an Administrative Law Judge ("ALJ") on February 20, 2014.
28   (R. at 35-80.) On April 18, 2014, the ALJ issued a decision denying Plaintiff's claim.

(R. at 22-29.) The Appeals Council upheld the ALJ's decision on August 28, 2014. (R. at 1-6.) The present appeal followed.

A.   **Medical Evidence**

1.   **Medical Treatment**

On February 21, 2011, Plaintiff went for a new patient visit to a cardiologist, Dr. Monica Escarzaga. (R. at 404.) Dr. Escarzaga noted Plaintiff's history of coronary artery disease and a 2009 stent placement. (R. at 404.) In her last stress echocardiogram, in 2010, Plaintiff had excellent exercise tolerance and no angina—chest pain caused by inadequate blood supply to the heart. (R. at 404.) Dr. Escarzaga "strongly advised" Plaintiff to quit smoking because of the increased risk of heart attack and stroke. (R. at 407.) On March 21, 2011, Plaintiff underwent another stress echocardiogram, and the results were normal with no evidence of infarction. (R. at 378.)

On May 8, 2011, upon experiencing chest pain, Plaintiff went to the emergency room of Banner Thunderbird Medical Center. (R. at 332-34.) The examining physician noted that Plaintiff has a "known history of coronary artery disease, but she continues to smoke." (R. at 332.)  The physician also noted Plaintiff's history of diabetes mellitus and hypertension. (R. at 332.) The results of the electrocardiogram were normal. (R. at 332.) On May 10, 2011, Plaintiff underwent a CT scan of her chest, and no evidence of pulmonary embolism was found. (R. at 331.) The physician recommended that Plaintiff follow-up with a cardiologist. (R. at 331.)

Plaintiff followed up with Dr. Escarzaga, on May 12, 2011. (R. at 394.) Dr. Escarzaga noted Plaintiff's recent visit to the hospital and Plaintiff's reports of neck and shoulder discomfort and occasional spasms. (R. at 394.) She also noted that the CT scan of Plaintiff's chest revealed a lung nodule and prominent lymph nodes. (R. at 394.) Dr. Escarzaga noted that Plaintiff's recent episode of chest discomfort occurred after she fell in the bathtub and concluded that it appeared to be musculoskeletal. (R. at 396.) She found Plaintiff's heart was functioning normally, treated Plaintiff with medication and strongly advised her to quit smoking. (R. at 396.)

On June 4, 2011, Plaintiff visited Arizona Pain Specialists (APS) for a consultation. (R. at 422.) She reported pain in her neck radiating to her right shoulder and upper right arm with numbness, tingling, and occasional weakness in her right hand. (R. at 422.) She had previously visited APS in January 2010, when APS ordered medial branch blocks but Plaintiff did not complete them. (R. at 422.) A 2009 MRI of the cervical spine revealed mild disc bulging at C5-C6 and C6-C7, and a 2009 EMG study revealed mild carpal tunnel syndrome. (R. at 422.) Plaintiff reported that the pain in her neck and shoulder began five years ago and is improved with hot/cold packs and medications. (R. at 422.) The APS nurse practitioner ordered an MRI, x-rays, physical therapy and epidural steroid injections. (R. at 424.)

A June 7, 2011 x-ray of the lumbar spine revealed "slight hypertrophic bony changes" but "[disc] spaces and body heights maintained" and lumbar spine "otherwise intact." (R. at 426.)  A June 10, 2011 x-ray and MRI of the cervical spine revealed mild arthropathy at several disc levels but no disc herniation present and otherwise unremarkable and unchanged from the previous x-ray. (R. at 427, 429.) Plaintiff went to APS for epidural injections in her back on August 9 and 18, and September 20, 2011. (R. at 419-21.)

On account of her history of coronary artery disease, the prior stent placement, and her reports of prolonged episodes of chest discomfort, Plaintiff underwent a cardiac catheterization on June 16, 2011. (R. at 300-02.) Plaintiff exhibited "mild-to-moderate coronary artery disease in all of the lesions" but "no flow-limiting lesion." (R. at 302.) The examining physician concluded that "it is likely that her nonexertional prolonged chest discomfort is nonanginal." (R. at 302.)

Upon a report of stress urinary incontinence, Plaintiff underwent a pelvic exam and cystoscopy—an examination of the inside of the bladder—on July 20, 2011. (R. at 317-18.) The exam did not indicate any serious injury or condition. (R. at 318.)

On August 24, 2011, Plaintiff returned to the emergency room of Banner Thunderbird Medical Center, reporting chest pain, shortness of breath, palpitations and

lightheadedness. (R. at 358.) In addition to noting Plaintiff's history of Type 2 diabetes, hypertension, coronary artery disease, hyperlipidemia, sleep apnea and exogenous obesity, the physician noted that Plaintiff was "undergoing a short sale of her home and she feels very stressed and has been going about frequently and having muscle spasms in the musculature of her upper back and shoulders, as well as the neck." (R. at 358-59.) The physician also stated that Plaintiff "says for the past 20 years each night if she has been busy, she gets pain in her back and legs, but this has not changed." (R. at 358.) The physician's initial clinical impression was "atypical chest pain, probably pleurisy"— inflammation of the lung membrane—or a musculoskeletal problem. (R. at 359.) After admission to the hospital, an examination revealed Plaintiff's heart was functioning normally. (R. at 365, 371.) Plaintiff's chest pain was relieved by pain medications and, upon release, Plaintiff was instructed to follow-up with her physician. (R. at 362-64, 374.)

Plaintiff followed up with Dr. Escarzaga on September 12, 2011. (R. at 380.) Dr. Escarzaga reported that Plaintiff takes pain medication as needed, "is doing well and is not having any more episodes of chest or neck discomfort," and "is trying to quit smoking." (R. at 380.) Dr. Escarzaga noted Plaintiff's previously mentioned medical history and again strongly advised Plaintiff to stop smoking. (R. at 382.) Dr. Escarzaga ordered Plaintiff to try yoga or acupuncture for her neck and shoulder pain and to follow-up in six months. (R. at 383-84.)

On September 14, 2011, Plaintiff saw a neurologist, Dr. Mark Winograd. (R. at 414-16.) Dr. Winograd concluded that, "neurologically she appears to be intact with one exception," "she probably had mild carpal tunnel [syndrome]." (R. at 415.) For Plaintiff's reports of shoulder pain, Dr. Winograd concluded she likely has "impingement or inflammation" at one of the deltoid muscles and was going to try epidural injections. (R. at 416.) With regard to Plaintiff's reports of pain all over, Dr. Winograd stated he would "defer to the rheumatologist in the management of the inflammatory polyarthropathy." (R. at 416.)

On October 13, 2011, Plaintiff saw a rheumatologist, Dr. Sheetal Chhaya, reporting chronic pain. (R. at 443-45.) Dr. Chhaya ordered blood tests and prescribed medication, concluding that the "clinical picture [was] more toward fibromyalgia." (R. at 445.)

On October 17, 2011, Plaintiff had an MRI of her lumbar spine, and the results were normal. (R. at 478.) Plaintiff then saw Dr. Bryan Wall at the Core Institute on November 2, 2011, still reporting neck pain. (R. at 481.) Dr. Wall noted that Plaintiff reported having the pain for more than ten years and that it was the result of several car accidents. (R. at 481.) After examining Plaintiff, Dr. Wall concluded that there was "no obvious explanation for the pain" and that "there isn't much that [he] can do for this patient," but that "the pain is closer to the spine and may be related to the patient's recently diagnosed fibromyalgia." (R. at 485.)

On November 3, 2011, Plaintiff visited Dr. Escarzaga for a follow-up. (R. at 491.) Dr. Escarzaga reported Plaintiff continued to smoke and made no new observations. (R. at 492.)

On December 13, 2011, Plaintiff visited another rheumatologist, Dr. Viji Mahadevan, reporting the previous diagnoses of fibromyalgia and Sjogren's syndrome, which is characterized by dry eyes and mouth. (R. at 547.) Dr. Mahadevan noted that Dr. Chhaya had prescribed medication in the previous visit but Plaintiff never started it. (R. at 547.) Dr. Mahadevan ordered treatment of Plaintiff for fibromyalgia, including a regular exercise program and medication. (R. at 550.)

On December 28, 2011, Plaintiff visited APS again, reporting neck pain. (R. at 519.) APS recommended additional branch blocks in the cervical spine, which had relieved Plaintiff's pain in the past, and disc decompression by way of physical therapy. (R. at 521.) On December 30, 2011, Plaintiff went to Banner Health Center for an office visit regarding her diabetes. (R. at 526.) The physician concluded that Plaintiff's diabetes mellitus type 2 was well controlled and continued her present management. (R. at 527.)

Plaintiff saw her primary care physician, Dr. Christine Harter, throughout 2011 and early 2012. (R. at 556-600.) On January 16, 2012, among Plaintiff's conditions, Dr. Harter noted that Plaintiff said the fibromyalgia medication made her feel better but that aquatic exercise made her feel worse. (R. at 562.) Dr. Harter recommended physical therapy. (R. at 564.)  Plaintiff saw another primary care physician, Dr. Usma Ahmad, on February 27, 2012, and the report of Plaintiff's conditions was unchanged apart from a new report of urinary hesitancy. (R. at 556-58.)

A two-year gap in care by Plaintiffs' physicians ensued because Plaintiff "ran out of her insurance," but she went to Maricopa County Clinic. (R. at 628, 642, 659-792.) On January 7, 2014, Dr. Ahmad examined Plaintiff again and made no new observations, generally observing that Plaintiff was stable. (R. at 624-26.) On January 9, 2014, Dr. Mahadevan examined Plaintiff again. (R. at 627-29.) He found Plaintiff had tenderness in seven trigger points. (R. at 629.) As he had in Plaintiff's previous visit, Dr. Mahadevan prescribed medication for fibromyalgia and recommended Plaintiff begin regular exercise. (R. at 629.)

### 2.    Medical Examinations

On June 15, 2012, a nurse practitioner, Alina Stanca, completed a Fibromyalgia Residual Functional Capacity (RFC) Questionnaire. (R. at 601-03.) In checklist form, Ms. Stanca concluded that Plaintiff had multiple tender points, numbness and tingling of upper extremities, severe fatigue, morning stiffness, depression and anxiety. (R. at 601.) She summarized Plaintiff's pain as "moderately severe" that could "frequently" interfere with attention and concentration and "constantly" result in failure to complete tasks in a timely manner. (R. at 603.)

On July 10, 2012, Plaintiff underwent a psychological examination by Dr. Greg Peetoom. (R. at 604-09.) Dr. Peetoom noted that Plaintiff drove to her appointment and regularly drives short distances, independently showers and changes clothing, does light housework, shops for groceries weekly, watches television, spends time on the computer, and manages her own finances. (R. at 604-05.) Plaintiff stated her chief complaint was

her physical issues. (R. at 604.) She reported that she was in three or four "whiplash-type" car accidents and she suffers from neck and shoulder pain, which her doctors say is fibromyalgia. (R. at 605.) Plaintiff felt her pain began to interfere with her work in 2008. (R. at 605.) She was diagnosed with depression some 12 years before, but she felt better with her medication. (R. at 605.) Plaintiff still smoked one pack of cigarettes per day but was trying to stop. (R. at 606.) Plaintiff scored 29 out of 30 on the mini-mental state examination and was generally able to complete the other tests administered. (R. at 606-07.) Dr. Peetoom noted Plaintiff was preoccupied with her medical issues. (R. at 606.) In sum, Dr. Peetoom found Plaintiff to be of average intelligence and gave her a psychological prognosis of "fair," noting that her psychological symptoms were well managed with medication and she can maintain normal activities of daily living. (R. at 607.)

On January 10, 2014, Dr. Ahmad completed a Pain Functional Capacity Questionnaire. (R. at 636-37.) In checklist form, Dr. Ahmad concluded that Plaintiff has moderate to moderately severe pain that would frequently interfere with attention and concentration and frequently result in failure to complete tasks in a timely manner. (R. at 636-37.) On January 14, 2014, Dr. Ahmad completed a Medical Assessment of Ability to Do Work Related Physical Activities Questionnaire. (R. at 638-40.) In checklist form, Dr. Ahmad concluded that Plaintiff could occasionally lift or carry less than ten pounds, stand and/or walk less than two hours in an eight hour day, sit for only two hours in an eight hour day, never crouch or crawl and occasionally climb, balance, stoop or kneel, and either never or only occasionally use her hands for various purposes. (R. at 638-39.)

### 3.    Non-Examining Physicians

On August 10, 2011, at the time of filing a claim for disability benefits, the interviewer found that Plaintiff was a hypochondriac based on Plaintiff's report of numerous disabilities and that she saw many doctors only once because she did not have time or was too busy to go back for follow-up appointments. (R. at 201.)    On December 12, 2011, Dr. Terry Ostrowski noted Plaintiff's medical history and that

Plaintiff worked as an accountant until January 2011, when her assignment came to an end. (R. at 82-92.) Dr. Ostrowski noted the doctors' observations that Plaintiff does her own housework, fixes meals, shops, drives a car and manages her finances and that medical treatment improved many of Plaintiff's symptoms. (R. at 82-92.) Dr. Ostrowski stated, "Medical records show that [Plaintiff experiences] some difficulty and discomfort" but that she is "not significantly restricted in [her] ability to get about and perform ordinary daily activities." (R. at 92.) Upon his examination of the medical evidence, he concluded that Plaintiff could lift 20 pounds occasionally and ten pounds frequently, stand about six hours in an eight-hour workday and sit for the same amount of time. (R. at 89.) He did not find that Plaintiff had other significant limitations, and he concluded that Plaintiff was able to perform her past work as an accountant and was therefore not disabled. (R. at 89-92.)

On July 16, 2012, after a review of additional records of Plaintiff's medical care, Dr. Erika Wavak reached essentially the same conclusions as Dr. Ostrowski. (R. at 94-112). Dr. Wavak found that Plaintiff's conditions resulted in some limitations but they were not severe enough to prevent Plaintiff from performing her past work as an accountant. (R. at 112.)

### B.    Hearing Testimony

At the hearing held on February 20, 2014, in response to the ALJ's questions, Plaintiff testified that she is 58 years old, stands five feet three inches tall, and weighs 189 pounds. (R. at 42, 55.) She no longer works other than helping her daughter, a beautician, about once a month by sweeping hair off the floor in her work area. (R. at 43.) She last worked as an accountant through a temporary agency until January 28, 2011— the alleged onset date. (R. at 44-45.) She had quit her prior full-time job with Xerox a month before in the hope that the new temporary position would become full-time, but the project she was working on changed in scope and she was no longer needed. (R. at 45-48.) She testified that, had the new position been the job she had been told about, she would have taken a full-time position because, at the time, she hoped she could continue

1   working. (R. at 48-49.) She applied for and received unemployment compensation for the

2   whole year of 2011 and three quarters of 2012. (R. at 50.) She interviewed for several

3   jobs during that period but did not get any offers. (R. at 51.)

4         Plaintiff testified that she drives a car at least once a week for shopping, doctor

5   appointments and the like. (R. at 53-54.) She does the few household chores that are

6   required, such as cooking, dishes and laundry, and she dresses and bathes herself. (R. at

7   54-56.) She is overweight, particularly on account of the medication she takes and her

8   less active lifestyle. (R. at 55.) On a typical day, she spends time outside smoking, on the

9   internet, and watching movies on television. (R. at 56, 58-59.) She, her daughters and her

10   sister visit each other regularly and her grandchildren visit her. (R. at 59-62.) She

11   travelled to Flagstaff in December 2012 for her son's graduation. (R. at 63.) She smokes

12   three-quarters of a pack to a full pack of cigarettes a day and drinks alcohol occasionally.

13   (R. at 63-64.) She and her children go out for dinner about twice a month. (R. at 64.) She

14   manages her own finances and pays her bills online. (R. at 66.)

15         With regard to pain, Plaintiff testified that, on and off, she has a sharp pain in her

16   shoulder or upper shoulder blade. (R. at 67-68.) She has fibromyalgia with pain that

17   "could be anywhere," including the big toe, knee, neck, shoulder and hip, and she takes

18   medication. (R. at 68-69.) She has pain in her feet from neuropathy that might be caused

19   by diabetes, for which she also takes medication. (R. at 69.) Her hands fall asleep, which

20   might be from carpal tunnel syndrome but for which she has not had surgery. (R. at 71.)

21   She has "trigger finger" in one thumb, for which she gets cortisone shots. (R. at 71.)

22   Sometimes she can walk for half an hour at a time, and other times she can walk for five

23   minutes. (R. at 73.) She can grocery shop for about an hour at a time with the help of a

24   cart. (R. at 74.)

25         The ALJ also examined Shirley Ripp, a Vocational Expert (VE), at the hearing.

26   The VE testified that Plaintiff's previous work as an accountant was sedentary. (R. at 75.)

27   Plaintiff's counsel asked the VE if Plaintiff could do her past work as an accountant with

28   the limitations identified by Dr. Ahmad in her functional assessment of Plaintiff, and the

1    VE answered, "No." (R. at 77.) The ALJ pointed out that Dr. Ahmad had found Plaintiff

2    to be less than sedentary such that, if Dr. Ahmad's findings were supported by the record,

3    Plaintiff would be ruled disabled. (R. at 77.)

4         **C.    The ALJ's Opinion**

5         In his opinion, for the period from the alleged onset date of January 28, 2011

6    onward, the ALJ concluded that Plaintiff was not engaged in substantial gainful activity

7    and had impairments of "fibromyalgia, osteoarthritis, coronary artery disease post stent

8    placement in 2009 and heart catheterization in 2011, basilar atelectasis/asthma with

9    tobacco dependence, and obesity," which in combination caused "more than minimal

10   impact on the claimant's ability to perform basic work activities" but did not equal any

11   listing under the pertinent regulations. (R. at 25.) The ALJ concluded that Plaintiff had

12   the RFC to perform light work except only occasionally climb, kneel or crawl; never

13   climb ladders, ropes or scaffolds; frequently stoop and crouch; and avoid extreme

14   temperatures and hazards. (R. at 26.)

15        The ALJ found that Plaintiff's impairments could reasonably be expected to cause

16   the alleged symptoms, but that her statements regarding the intensity, persistence and

17   limiting effects of these symptoms were not entirely credible because (1) Plaintiff

18   stopped working on the alleged onset date because her job came to an end, not because

19   she was unable to work; (2) she interviewed for other jobs and collected unemployment

20   for almost two years after the alleged onset date; (3) her activity level—including helping

21   her daughter at work, regularly driving a car, using a computer for e-mails, games and

22   bill-paying, cooking, doing the dishes, doing the laundry, cleaning, making her bed,

23   visiting and hosting her family, and traveling—was inconsistent with her allegations of

24   disability; and (4) treatment records showed that the coronary artery disease and diabetes

25   were under control, only mild musculoskeletal problems were present, her fibromyalgia

26   symptoms were not disabling, and her condition was exacerbated by obesity and smoking

27   but not to the point of precluding work activities altogether. (R. at 27.)

28

1    The ALJ gave great weight to the assessment of state examining physician
2    Dr. Wavak and significant weight to the assessment of Dr. Ostrowski, because they were
3    consistent with the medical treatment records and Plaintiff's ability to perform the
4    activities of daily living. (R. at 28.) The ALJ gave little weight to the assessment of
5    treating physician Dr. Ahmad because it was in checklist form with little supporting
6    objective evidence; indeed, it was inconsistent with Plaintiff's treatment records, which
7    did not suggest significant limitations in functional capacity, and Plaintiff scored 29 out
8    of 30 in the Mini Mental Status examination. (R. at 28.)  Likewise, the ALJ gave little
9    weight to the fibromyalgia assessment of Ms. Stanca, because she is a nurse practitioner.
10   (R. at 28-29.) Moreover, the assessment was in checklist form and inconsistent with
11   Plaintiff's ability to perform daily activities and the examining psychologist's findings of
12   Plaintiff's ability to maintain attention and concentration. (R. at 28.)

13   The ALJ concluded that Plaintiff was not disabled under the Act from the alleged
14   onset date to the date of the ALJ's opinion because, considering Plaintiff's RFC, Plaintiff
15   could perform her past relevant work as an accounting clerk, which requires only
16   sedentary exertion and has no postural requirements. (R. at 29.)

17   **II.    ANALYSIS**

18   The district court reviews only those issues raised by the party challenging the
19   ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). The court
20   may set aside the Commissioner's disability determination only if the determination is not
21   supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625,
22   630 (9th Cir. 2007). Substantial evidence is more than a scintilla, but less than a
23   preponderance; it is relevant evidence that a reasonable person might accept as adequate
24   to support a conclusion considering the record as a whole. *Id.* In determining whether
25   substantial evidence supports a decision, the court must consider the record as a whole
26   and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.*
27   As a general rule, "[w]here the evidence is susceptible to more than one rational
28   interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be

1 upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).

2       To determine whether a claimant is disabled for purposes of the Act, the ALJ

3 follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of

4 proof on the first four steps, but the burden shifts to the Commissioner at step five.

5 *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ

6 determines whether the claimant is presently engaging in substantial gainful activity.

7 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled and the inquiry ends. *Id.*

8 At step two, the ALJ determines whether the claimant has a "severe" medically

9 determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If not, the

10 claimant is not disabled and the inquiry ends. *Id.* At step three, the ALJ considers whether

11 the claimant's impairment or combination of impairments meets or medically equals an

12 impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R.

13 § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not,

14 the ALJ proceeds to step four. *Id.* At step four, the ALJ assesses the claimant's RFC and

15 determines whether the claimant is still capable of performing past relevant work.

16 20 C.F.R. § 404.1520(a)(4)(iv). If so, the claimant is not disabled and the inquiry ends.

17 *Id.* If not, the ALJ proceeds to the fifth and final step, where he determines whether the

18 claimant can perform any other work in the national economy based on the claimant's

19 RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If so, the

20 claimant is not disabled. *Id.* If not, the claimant is disabled. *Id.*

21     **A.**    **The ALJ Assigned Proper Weight to the Assessments of Plaintiff's**
22             **Treating Physicians and Properly Considered the Record as a Whole**

23       Plaintiff disputes the ALJ's findings at step four of the five-step process,

specifically, that when considering the combination of Plaintiff's impairments, Plaintiff's

24 RFC allowed her to perform her past relevant work. Plaintiff's first argument is that the

25 ALJ committed reversible error by assigning inadequate weight to the assessments of

26 Plaintiff's medical care providers. (Pl.'s Br. at 12-18.) Defendant argues that the ALJ

27 properly weighed the treating professionals' assessments, giving specific and legitimate

28

reasons supported by substantial evidence in the record for giving little weight to certain assessments. (Def.'s Br. at 4-15.)

An ALJ "may only reject a treating or examining physician's uncontradicted medical opinion based on 'clear and convincing reasons.'" *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1164 (9th Cir. 2008) (citing *Lester v. Chater*, 81 F. 3d 821, 830-31 (9th Cir. 1996)).  "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*

In this instance, the ALJ found that the assessments of one of Plaintiff's treating physicians, Dr. Ahmad, and of a treating nurse practitioner, Ms. Stanca, are contradicted by the assessments of Drs. Wavak and Ostrowski. (R. at 28-29.) The ALJ first found that the assessments were inconsistent with Plaintiff's treatment records, citing the cardiologist's reports that Plaintiff's coronary artery disease had been treated and did not result in significant physical limitations, evidence that Plaintiff's diabetes was under control, mental test results indicating no significant limitations, evidence that Plaintiff's posture and gait did not indicate disabling pain, and evidence that, while Plaintiff's obesity exacerbated her condition, it did not preclude physical activity. (R. at 27-28.) With regard to Ms. Stanca, the ALJ also properly considered the fact that she is a nurse practitioner and thus not the "most qualified health professional." (R. at 29.) Under the relevant regulations, a nurse practitioner does not qualify as an "acceptable treating source" but is instead defined as an "other source," 20 C.F.R. § 404.1513(d)(1), and, as such, an ALJ may if justified give less weight to the opinion of a nurse practitioner, *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

The ALJ also found that the medical professionals' assessments were inconsistent with Plaintiff's ability to exert herself to do her household work, drive and shop. (R. at 28.) While a claimant need not be "utterly incapacitated" to be considered disabled under the Act, *Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005), Plaintiff's testimony supports the conclusion that she had the functional capacity to regularly clean, cook, use

1    a computer, watch television, help her daughter at work, visit family, and occasionally

2    travel. This testimony is inconsistent with, for example, the significant physical

3    limitations Dr. Ahmad attributed to Plaintiff. Considering the record as a whole, the

4    Court finds the ALJ's reasons for assigning little weight to the functional capacity

5    assessments of Dr. Ahmad and Ms. Stanca were specific, legitimate, and supported by

6    substantial evidence.

7              **B.      The ALJ Properly Weighed Plaintiff's Testimony**

8              Plaintiff also argues that the ALJ erred in his consideration of Plaintiff's symptom

9    testimony. (Pl.'s Br. at 18-22.) In response, Defendant contends that the ALJ gave

10   Plaintiff's testimony the proper weight because some of her testimony was not supported

11   by objective medical evidence, Plaintiff was successful in controlling her symptoms with

12   medication and other treatment, Plaintiff engaged in physical activity despite her claimed

13   limitations, Plaintiff's last job ended not because of a disability but for business reasons,

14   and Plaintiff collected unemployment and searched for another job for almost two years

15   of the claimed disability period. (Def.'s Br. at 17-23.)

16             While credibility is the province of the ALJ, an adverse credibility determination

17   requires the ALJ to provide "specific, clear and convincing reasons for rejecting the

18   claimant's testimony regarding the severity of the claimant's symptoms." *Treichler v.*

19   *Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (citing *Smolen v. Chater*, 80

20   F.3d 1273, 1281 (9th Cir. 1996)). The ALJ generally credited Plaintiff's testimony that

21   she could help her daughter in the beauty salon, work on her computer for an hour at a

22   time with breaks, do housework, watch television, and visit with family. (*See* R. at 53-

23   66.) However, the ALJ disagreed with certain statements of Plaintiff regarding the

24   intensity, persistence and limiting effects of her conditions and her conclusion that she

25   was "less than sedentary." (R. at 27, 41.)

26             In the instances in which the ALJ assigned little value to Plaintiff's statements, the

27   Court finds the ALJ gave sufficient justification. For example, the ALJ pointed out that

28   Plaintiff applied and interviewed for other jobs during the alleged period of disability,

which does not disqualify Plaintiff from seeking disability benefits but is at least inconsistent with Plaintiff's statement that she was incapable of working. (*See* R. at 27.) Moreover, Plaintiff's testimony as to the limiting effects of her conditions was inconsistent with her medical treatment, in which doctors either found no physical limitations or, when Plaintiff went to a follow-up checkup, that her condition improved with medication and other treatment. (*See* R. at 27.) In addition, as the Court has already discussed, Plaintiff's claim that she was "less than sedentary" is inconsistent with her own testimony regarding her ability to perform daily activities, work on the computer, or visit family and travel. (*See* R. at 27.) For all these reasons, the Court finds the ALJ properly weighed Plaintiff's testimony as to her limitations. *See* 20 C.F.R. § 404.1529(c)(3); *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *Warre ex rel. E.T. IV v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).

## III.   CONCLUSION

Plaintiff raises no error on the part of the ALJ, and the SSA's decision denying Plaintiff's Application for a Period of Disability and Disability Insurance Benefits under the Act was supported by substantial evidence in the record.

IT IS THEREFORE ORDERED affirming the April 18, 2014, decision of the Administrative Law Judge, (R. at 22-29), as upheld by the Appeals Council on August 28, 2014 (R. at 1-6).

IT IS FURTHER ORDERED directing the Clerk to enter final judgment consistent with this Order and close this case.

Dated this 4th day of March, 2016.

Honorable John J. Tuchi
United States District Judge